UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFREY FRIES, Individually and On Behalf of
All Others Similarly Situated,

                              Plaintiff,

          - against -

NORTHERN OIL AND GAS, INC., MICHAEL L.
REGER, and THOMAS W. STOELK,

                              Defendants.

**OPINION AND ORDER**

16 Civ. 6543 (ER)

---

Ramos, D.J.:

        This class action arises out of alleged violations of the Securities Exchange Act of 1934

by Northern Oil and Gas, Inc. ("Northern Oil"), Michael L. Reger ("Reger"), and Thomas W.

Stoelk ("Stoelk," collectively, the "Defendants").  Lead plaintiff Matthew Atkinson ("Plaintiff"

or "Atkinson") asserts causes of action individually and on behalf of others similarly situated

against Defendants for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of

1934, and Rule 10b–5 promulgated thereunder.  Plaintiff generally alleges that Defendants made

false and misleading statements in their public filings and comments.  Before this Court is

Defendants' motion to dismiss the Consolidated Amended Complaint ("CAC") in its entirety

pursuant to the Federal Rule of Civil Procedure 12(b)(6).

        For the reasons set forth below, Defendants' motion is GRANTED without prejudice.

I.      **Background**

A.      **Factual Background[1]**

1.   **Parties**

Plaintiff brings this action individually and on behalf of all persons, other than

Defendants, who purchased or otherwise acquired Northern Oil securities from March 1, 2013 to

August 15, 2016 (the "Class Period").  CAC ¶ 1.

Northern Oil is an independent energy company engaged in the acquisition, exploration,

development, and production of oil and natural gas properties in the United States, primarily

holding interests in the Williston Basin of North Dakota and Montana.  *Id.* ¶¶ 2, 31.  It was co-

founded by Reger and Ryan Gilbertson ("Gilbertson"), a non-party, in 2006.  *Id.* ¶¶ 4-5, 32.  In

2007, Northern Oil became a public company through a reverse merger whereby it merged into a

company that had publicly-traded stock.  *Id.* ¶ 33.  It is incorporated in Minnesota and is

headquartered in Wayzata, Minnesota.  *Id.* ¶¶ 3, 25.

The two individual Defendants occupied executive positions at Northern Oil during the

Class Period.  Reger served as Northern Oil's Chief Executive Officer ("CEO") from 2007 until

his termination on August 16, 2016.  *Id.* ¶ 26.  Reger sold over 550,000 shares of Northern Oil

common stock during the Class Period for tax purposes.  *Id.*; Doc. 41 ("Hammel Decl.") Ex. 20-

36.  Stoelk served as Northern Oil's Chief Financial Officer ("CFO") at all relevant times, and

became the interim CEO upon Reger's termination.  CAC ¶ 28.  Stoelk sold over 78,000 shares

of Northern Oil common stock during the Class Period for tax purposes.  *Id.*; Hammel Decl. Ex.

4-19.

---

[1] The following facts are drawn from allegations contained in the CAC, Doc. 25, which the Court accepts as true for purposes of the instant motion, and matters subject to judicial notice.  *See New York Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 86 (2d Cir. 2017) (citation omitted).

## 2.      Reger's Conduct at Dakota Plains

In 2008, Reger and Gilbertson co-founded another company named Dakota Plains Transport Inc., which became a public company named Dakota Plains Holdings, Inc. ("Dakota Plains") on March 22, 2012.  CAC ¶ 34.  Dakota Plains, a non-party, is a "transloading" facility that loads crude oil into railway cars in New Town, North Dakota, and is wholly unrelated to Northern Oil.  *Id.* ¶¶ 5, 29.  It is a Nevada corporation with its principal executive offices in Wayzata, Minnesota.  *Id.* ¶ 29.

Plaintiff alleges that Reger and Gilbertson improperly exercised control over Dakota Plains.  *Id.* ¶¶ 5, 35-51.  Specifically, when Dakota Plains became a public company, Reger controlled 21.4% of its stock and 33.3% of its promissory notes, and Gilbertson controlled 11% of its stock and 38.9% of its promissory notes.  *Id.* ¶¶ 26-27.  However, in order to conceal the full extent of their involvement, they did not hold any formal positions at Dakota Plains.  *Id.* ¶ 36.  Instead, they named Reger's father as CEO and Gilbertson's father as President, and later installed one of their friends as CEO.  *Id.* ¶¶ 36, 40.  Reger also held his Dakota Plains stock in ten different accounts over which he had beneficial ownership, with each account holding no more than 5% of the stock.  *Id.* ¶¶ 48-51.  Without disclosing their control or ownership, Reger and Gilbertson used their influence to improperly obtain financial benefits for themselves, including through a stock manipulation scheme.[2]

---

[2] Reger and Gilbertson caused Dakota Plains to issue promissory notes, which they purchased in large part.  *Id.* ¶¶ 39, 41.  Some of the promissory notes' proceeds were used to pay shareholder dividends for Reger and Gilbertson's benefit.  *Id.* ¶ 39.  Furthermore, Gilbertson, with Reger's knowledge and consent, directed Dakota Plains to include an "additional payment" provision in the notes that allowed noteholders to receive bonus payments based on the average price of Dakota Plains' stock in the first twenty days of public trading.  *Id.* ¶ 42.  On May 15, 2012, Dakota Plains disclosed that noteholders were entitled to receive notes or stock worth $32,851,800 pursuant to the additional payment provision.  *Id.* ¶ 45.  However, Dakota Plains failed to disclose that Reger and Gilbertson were the main beneficiaries.  *Id.*

On February 20, 2015, Dakota Plains reported Reger and Gilbertson's potential violations of securities laws at that company to the United States Securities and Exchange Commission ("SEC"). *Id.* ¶ 52. Thereafter, the SEC sent Reger a Wells Notice[3] in connection with the Dakota Plains investigation. *Id.* ¶¶ 15, 109. On August 16, 2016, after Reger informed Northern Oil of the Wells Notice, Northern Oil terminated Reger. *Id.* On that day, Northern Oil stock fell by 6.28%. *Id.* ¶ 110. On October 31, 2016, the SEC issued a cease and desist order against Reger concerning his role at Dakota Plains, in which he agreed to cease and desist from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933, and Sections 13(d) and 16(a) of the Securities Exchange Act of 1934; and to make disgorgement and penalty payments. *Id.* ¶ 111; *see* Hammel Decl. Ex. 3.

### 3. Reger's Conduct at Northern Oil

Plaintiff claims that, during the Class Period, Reger neglected his responsibilities as the CEO of Northern Oil, and instead, appropriated Northern Oil resources to further his control of Dakota Plains. CAC ¶ 55. Plaintiff relies on three confidential witnesses ("CWs"). CW 1, a former executive assistant at Northern Oil headquarters from January 2009 through September 2015 who reported directly to Reger, asserts Reger went to the Northern Oil headquarters in Wayzata, Minnesota three or four days a week for brief periods of time, and that Stoelk effectively ran Northern Oil during Reger's last few years at the company. *Id.* ¶ 58. At Northern Oil headquarters, Reger worked on Dakota Plains matters, including holding meetings with Dakota Plains directors and investors. *Id.* ¶¶ 60-61. CW 1 "regularly ferried Dakota Plains-related personnel . . . to and from Northern Oil headquarters." *Id.* ¶ 61. Reger also used

---

[3] A Wells Notice is a notice that the SEC sends to an individual or entity at the conclusion of an investigation informing the recipient that the SEC's enforcement division intends to recommend an enforcement action against them. *Id.* ¶ 15 n. 2.

Northern Oil sponsored tours of Northern Oil facilities in North Dakota to pitch hedge funds and other investment entities on Dakota Plains.  *Id.* ¶ 62.

CW 2, a former vice president of engineering at Northern Oil headquarters from November 2011 through November 2015 who reported directly to Reger and Stoelk, states that Reger had little to no involvement in the day-to-day operations at Northern Oil, and instead, spent most of his time pursuing acquisitions or working on matters related to Dakota Plains.  *Id.* ¶ 64.  He further attests that Reger's role at Dakota Plains was an open secret at Northern Oil, of which Stoelk was aware.  *Id.* ¶¶ 65-66.

CW 3, a former vice president of operations for Dakota Plains in Wayzata, Minnesota from April 2012 to February 2013, recalls spending more time in Northern Oil's offices than Dakota Plains' own offices, which was located half a block away from Northern Oil's headquarters.  *Id.* ¶¶ 53, 71.  He states that "Dakota Plains functioned under the direction of Northern Oil."  *Id.* ¶ 71.

### 4.    Defendants' Alleged False or Misleading Representations

Plaintiff alleges that, in light of Reger's misconduct, Defendants made fraudulent representations and omissions in their public filings and other public comments.  Specifically, Northern Oil stated in each of its Form 10-Ks for the years ended December 31, 2012, December 31, 2013, December 31, 2014 and December 31, 2015 that it "adopted a Code of Business Conduct and Ethics that applies to [Northern Oil's] chief executive officer, chief financial officer and persons performing similar functions [and that a] copy is available on [Northern Oil's] website at www.northernoil.com."  *Id.* ¶¶ 74, 89, 98, 103.  Reger and Stoelk signed certifications as to the accuracy of each of these public filings.  *See* Northern Oil and Gas, Inc., Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K) (March 1,

2013); Northern Oil and Gas, Inc., Annual Report Pursuant to Section 13 or 15(d) of the

Securities Exchange Act of 1934 (Form 10-K) (March 3, 2014); Northern Oil and Gas, Inc.,

Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-

K) (February 27, 2015); Northern Oil and Gas, Inc., Annual Report Pursuant to Section 13 or

15(d) of the Securities Exchange Act of 1934 (Form 10-K) (March 3, 2016).  Northern Oil's

Code of Business Conduct and Ethics states in relevant part the following:

- "It is the policy of [Northern Oil] that all employees and directors comply strictly with all laws governing its operations and to conduct its affairs in keeping with the highest moral, legal and ethical standards.  In particular, senior executives hold an important and elevated role in maintaining a commitment to (i) honest and ethical conduct; (ii) full, fair, accurate, timely and understandable disclosure in [Northern Oil]'s public communications, and (iii) compliance with applicable government rules and regulations."  *Id.* ¶ 75 (emphasis omitted).

- "[Northern Oil] proactively promotes ethical behavior.  Employees should report violations of applicable laws, rules and regulations, this Code or any other code, policy or procedure of [Northern Oil] to appropriate personnel. Officers of [Northern Oil] should report any such violation directly to the chief executive officer and/or the chief financial officer.  Employees and directors are expected to cooperate in internal investigations of misconduct."  *Id.*

- "All employees and directors should protect [Northern Oil]'s assets and ensure their efficient use.  All [Northern Oil] assets should be used for legitimate business purposes only.  The use of assets of [Northern Oil] for any unlawful or improper purpose is strictly prohibited.  Theft, carelessness, and waste have a direct impact on [Northern Oil]'s profitability."  *Id.*

- "A conflict of interest exists where one or both parties in a relationship receive or give unfair advantage of preferential treatment because of the relationship and the term 'conflict of interest' describes any circumstance that could cast doubt on a person's ability to act with total objectivity with regard to [Northern Oil]'s interest.  Conflicts of interest are prohibited as a matter of [Northern Oil] policy. . . . All employees must conduct business in a manner that avoids even the appearance of conflict between personal interests and those of [Northern Oil]. . . . Also, employees are prohibited from directly or indirectly competing, or performing services for any person or entity in competition with, [Northern Oil]."  *Id.*

Plaintiff asserts that these statements are materially false and/or misleading because (1) Northern Oil's policies and Code of Business Conduct and Ethics were inadequate to either detect or prevent misconduct by Northern Oil officers, (2) Reger's misconduct violated Northern Oil's assurance to investors that its executives would maintain honest conduct and adhere to applicable laws and regulations, (3) Reger's blatant misuse of Northern Oil's assets violated Northern Oil's commitment to investors to safeguard those assets for legitimate purposes, and (4) Reger's involvement in Dakota Plains violated Northern Oil's prohibition of conflicts of interest. *Id.* ¶¶ 78, 93, 102, 106.

Defendants also made certain representations concerning Reger's personal experience in the oil industry. Specifically, Northern Oil made the following alleged misrepresentations in its 2012, 2013, 2014 and 2015 10-Ks:

- "To continue to develop our business, we rely on our management team's knowledge and expertise in the industry and will use our management team's relationships with industry participants, specifically those of Mr. Reger our Chief Executive Officer, to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual arrangements with other oil and natural gas companies." *Id.* ¶¶ 76, 91, 100, 105 (emphasis omitted).

- "Michael L. Reger is a founder of our predecessor, Northern Oil and Gas, Inc., and has served as Chairman of the Board and Chief Executive Officer of our company since March 2007. Mr. Reger has been involved in the acquisition of oil and gas mineral rights for his entire career. Mr. Reger began working the oil and gas leasing business for his family's company, Reger Oil, in 1992 and worked as an oil and gas landman for Reger Oil from 1992 until co-founding Northern [Oil] in 2006. Mr. Reger holds a B.A. in Finance and an M.B.A. in finance/management from the University of St. Thomas in St. Paul, Minnesota. The Reger family has a history of acreage acquisition in the Williston Basin dating to 1952." *Id.* ¶¶ 77, 92, 101, 106 (emphasis omitted).

Reger also represented on August 14, 2013, October 2, 2013, October 17, 2013, November 12, 2013, August 20, 2014 and November 12, 2014 that he is "a fourth generation landman," which

gave Northern Oil certain early advantages such as knowledge of the landscape and long-standing relationships with operators.  *Id.* ¶¶ 79, 81, 83, 85, 94, 96.  A Northern Oil executive further represented on December 12, 2013 that Reger has "a four generation advantage on the ground in [the Williston] [B]asin."  *Id.* ¶ 87.

Plaintiff argues that these statements concerning Reger were rendered either false and/or misleading because Defendants improperly failed to disclose Reger's ownership in and control over Dakota Plains, his violation of SEC regulations, and participation in a stock manipulation scheme.  *Id.* ¶¶ 114-115.  Northern Oil's outsized reliance on Reger allowed him to run Dakota Plains and engage in illegal stock manipulation, and this dependence on Reger also caused Northern Oil to overlook flagrant ethical violations.  *Id.* ¶¶ 78, 80, 82, 84, 86, 88, 93, 95, 97, 102, 106.  Defendants' misrepresentations and omissions induced Plaintiff into paying artificially inflated prices for Northern Oil stock.  *Id.* ¶ 115.

### B.    Procedural History

On August 18, 2016, plaintiff Jeffrey Fries filed the Complaint individually and on behalf of all others similarly situated.  Doc. 1.  On October 17, 2016, plaintiffs Atkinson and Richard Miller ("Miller") filed a motion for joint appointment as lead plaintiffs.  Doc. 6.  On May 8, 2017, the Court declined to grant joint appointment and appointed Atkinson to serve individually as lead plaintiff, finding that he was the most adequate plaintiff due to his timely application to be appointed as lead plaintiff, his large financial stake, typicality of his claims, and adequacy of his representation.  Doc. 20.  On July 6, 2017, Atkinson filed the CAC.  Doc. 25.  On August 21, 2017, Defendants filed the instant motion to dismiss the CAC pursuant to Rule 12(b)(6).  Docs. 36, 38.

## II.      Legal Standard

### A.      Motion to Dismiss

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

In determining the motion to dismiss, the Court may "consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken."  *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 Fed. Appx. 448 (2d Cir. 2015) (summary order) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  The Court may "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the

adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *Silsby*, 17 F. Supp. 3d at 354 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 Fed. Appx. 93 (2d Cir. 2014) (summary order).

### A.  Heightened Pleading Standard under Rule 9(b)

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by stating the circumstances constituting fraud with particularity.  *See, e.g., ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 320-21 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim.  *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'")

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *See, e.g., Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).  Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)

(quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); s*ee also, e.g., Slayton v. Am. Express, Co*., 604 F.3d

758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general

standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear

that "plaintiffs must provide sufficient particularity in their allegations to support a plausible

inference that it is more likely than not that a securities law violation has been committed." *In re*

*Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir.

2015) (citing *ECA & Local 134 IBEW*, 553 F.3d at 196).

## III.    Discussion

### A.  Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in

connection with the purchase or sale of any security . . . any manipulative or deceptive device or

contrivance," 15 U.S.C. § 78j(b) (1934), while SEC Rule 10b-5, promulgated thereunder, creates

liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a

material fact . . . in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*,

971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b–5 (1951)).  Rule 10b–5,

promulgated by the SEC to implement Section 10(b), "more specifically delineates what

constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv. Servs.*

*Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b–5, it is unlawful for any person,

directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue
> statement of a material fact or to omit to state a material fact necessary in order to
> make the statements made, in the light of the circumstances under which they were
> made, not misleading, or (c) To engage in any act, practice, or course of business

which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.  *Dura*, 544 U.S. at 341-42; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007).  Defendants argue that Plaintiff failed to adequately allege that Defendants made actionable misrepresentations or omissions, or acted with scienter.

### 1.  Plaintiff Fails to Allege Misstatements or Omissions of Material Fact

Plaintiff alleges that Defendants made material misstatements or omissions regarding Northern Oil's Code of Business Conduct and Ethics, and Reger's importance at Northern Oil. The Court addresses each claim in turn.

First, Plaintiff argues that Northern Oil's statement concerning the Code of Business Conduct and Ethics and the provisions therein were misleading because Defendants failed to disclose Reger's misconduct.  This argument is unavailing.  The mere adoption of a code of ethics is not rendered misleading by an undisclosed breach thereof.  *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2017 WL 1169629, at *11 (S.D.N.Y. Mar. 28, 2017) ("a defendant's mere adoption of a code of ethics, without statements assuring investors that its employees are in fact in compliance with the code, is not misleading.") (citing *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016)); *see also Barrett v. PJT Partners Inc.*, No. 16 Civ. 2841 (VEC), 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (rejecting plaintiff's argument that statements regarding the existence of a company's internal

controls are false because an employee failed to comply).  Furthermore, an undisclosed breach of

a corporate code of conduct is not actionable if defendants made no guarantees that the code

would be followed or representations of historical compliance.  *In re Banco Bradesco S.A. Sec.

Litig.*, No. 16 Civ. 4155 (GHW), 2017 WL 4381407, at *41 (S.D.N.Y. Sept. 29, 2017); *see also*

*In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 756 (S.D.N.Y. 2017) ("An undisclosed

breach of [a corporate] standard of conduct is . . . without more, not actionable under the

securities laws."); *Lopez*, 173 F. Supp. 3d at 29 ("[A] code of ethics . . . is inherently

aspirational; it simply cannot be that every time a violation of that code occurs, a company is

liable under federal law for having chosen to adopt the code at all, particularly when the adoption

of such a code is effectively mandatory.") (citation omitted).  There are no allegations in the

CAC showing that Defendants made such guarantees or representations of historical compliance

in the Code of Business Conduct and Ethics or otherwise.  The code merely lays out Northern

Oil's policies, including prohibited employee conduct, and notes what Northern Oil "promotes"

and what Northern Oil employees "should" do.[4]  CAC ¶ 75.

Plaintiff argues in its opposition papers that Defendants are nonetheless liable because

they misled Northern Oil shareholders by "repeatedly tout[ing]" and "parad[ing]" its "much-

ballyhooed" code.  Opp. at 2, 6, 13-14.  At least one court in this district found that repeated

assurance of a company's general integrity and ethical soundness despite knowledge of

employee non-compliance may be actionable.  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368,

381 (S.D.N.Y. 2015).  However, the Court finds no allegations in the CAC showing that

---

[4] Plaintiff claims in its opposition papers that Northern Oil "specifically highlighted the compliance of their senior executives with government regulations."  Doc. 43 ("Opp.") at 13.  However, the CAC contains no such facts.  The CAC merely states that the code provides that Northern Oil executives have "an important and elevated role in maintaining a commitment to . . . honest and ethical conduct."  CAC ¶ 75.  This statement is not a guarantee of the executives' future compliance, nor a representation of their prior compliance.

Defendants made such assurances.  Rather, the CAC only alleges that they informed investors that Northern Oil adopted the code and that the code is available on Northern Oil's website. CAC ¶ 75.  Accordingly, Plaintiff fails to allege an actionable misstatement or omission with respect to the Code of Business Conduct and Ethics.

Second, Plaintiff argues that Defendants misled Northern Oil investors by emphasizing Reger's importance to the company while failing to disclose Reger's misconduct.  Plaintiff claims that once Defendants spoke of Reger's value to Northern Oil, they were obligated to disclose facts which made Reger an unfit CEO.  Defendants argue that there is no authority for Plaintiff's proposition, and that they have no duty to disclose corporate mismanagement or uncharged criminal conduct.

Allegations that defendants concealed corporate mismanagement or uncharged criminal conduct are not actionable unless the non-disclosures render other statements by defendants misleading.  *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (citations omitted); *see also Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) (Section 10(b) does not reach mere "instances of corporate mismanagement.") (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977)); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) ("[W]here the conduct involves deception related to the mismanagement—and not mismanagement alone—the claims are actionable under the federal securities laws.") (citation omitted).  In making that determination, courts must consider whether the omitted mismanagement or uncharged criminal conduct is "sufficiently connected to defendants' existing disclosures."  *In re Sanofi Sec. Litig.*, 155 F.Supp.3d 386, 403 (S.D.N.Y. 2016) (citations omitted); *see also Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) (noting that revealing one fact about

a subject does not trigger a duty to reveal all facts on the subject, so long as "what was revealed would not be so incomplete as to mislead.") (citation omitted).  Specifically, the requisite connection triggering a duty to disclose arises in the following three circumstances:

> (1) when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices; (2) when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring; and (3) when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief.

*In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) (internal quotations and citations omitted).

Plaintiff alleges that Defendants made the following representations about Reger: (1) Northern Oil relies on executives' knowledge and expertise in the industry, and specifically relies on Reger's relationships with industry participants; (2) Reger has been involved in the acquisition of oil and gas mineral rights for his entire career; (3) Reger is a fourth generation landman in the Williston Basin; and (4) Reger's knowledge of the landscape and relationships gave Northern Oil certain early advantages.  *Id.* ¶¶ 76-77, 79, 81, 83, 85, 87, 91-92, 94, 96, 100-01, 105-06.  However, Plaintiff does not claim that these statements are inaccurate in and of themselves.  Further, the omitted facts do not show that Northern Oil did not rely on Reger's knowledge and expertise in the industry, that Reger did not have the pedigree Northern Oil represented, or that Reger's experience and expertise did not give Northern Oil certain early advantages.  *See e.g. Richman*, 868 F. Supp. 2d at 274 (S.D.N.Y. 2012) (finding that defendants were not required to disclose the receipt of a Wells Notice as their prior disclosure contained nothing concerning investigations that could be considered inaccurate or incomplete); *cf. Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 94, 99 (2d Cir. 2001) (finding that defendants deliberately misrepresented the abilities of an executive because they stated that the

15

executive had no pending civil suits and failed to disclose, *inter alia*, lawsuits that have been brought against him).  Nor do any of the highlighted statements suggest that Reger was not engaged in the undisclosed improper activities.  *See e.g. In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (finding that defendants' "statements are not misleading because they do not suggest that the undisclosed improper activity alleged by [p]laintiff was not occurring.").  Accordingly, the Court finds that Plaintiff also fails to allege an actionable misstatement or omission related to Defendants' representations about Reger.[5]

### 2.   Plaintiff Fails to Allege Scienter

Defendants argue that even if Plaintiff had sufficiently alleged an actionable misrepresentation or omission, his claims must further fail for the independent reason that Plaintiff has inadequately pled scienter.  The Court agrees.

Section 10(b) and Rule 10b–5 require plaintiffs to allege a state of mind demonstrating "an intent to deceive, manipulate or defraud," also known as scienter.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)); *see also, e.g., In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 469 (S.D.N.Y. 2004).  To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts

---

[5] Plaintiff also argues in a footnote that Reger and Stoelk improperly sold securities based on nonpublic information that they should have disclosed prior to trading.  Insider trading liability arises when an insider trades shares based on material nonpublic information without disclosing that information.  *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014) (citations omitted).  However, SEC filings show that Reger and Stoelk sold stocks for tax purposes, and Plaintiff does not allege any facts suggesting otherwise.  *See* Hammel Decl. Exs. 4-19, 20-36; *see also Silsby*, 17 F. Supp. 3d at 354 (courts may "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'").  Plaintiff has not cited any authority, and the Court is aware of none, that imposes disclosure obligations on executives when they forfeit stock for tax purposes.  Indeed, courts in this district have held that stock sales for tax reasons are *not* indicative of fraud.  *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (citing *Ressler v. Liz Claiborne Inc.*, 75 F.Supp.2d 43, 59-60 (S.D.N.Y. 1999)).  Accordingly, the Court finds that Plaintiff cannot premise his Section 10(b) and Rule 10b-5 claims on Reger and Stoelk's stock sales for tax purposes.

with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW*, 553 F.3d at 198 (citations omitted).  A "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (emphasis added).  This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff . . .  but also competing inferences rationally drawn from the facts alleged." *Id.*  "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a *strong* inference of scienter, not whether any *individual* allegation, scrutinized in isolation, meets that standard.'" *In re Magnum Hunter Res. Corp. Sec. Litig.*, No. 13 Civ. 2668 (KBF), 2014 WL 2840152, at *17 (S.D.N.Y. June 23, 2014) (emphasis in original) (citing *Tellabs*, 551 U.S. at 322–23, 127).

"When the defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc*., 531 F.3d 190, 195 (2d Cir. 2008).  The "most straightforward way to raise such an inference for a corporate defendant" in most cases is "to plead it for an individual defendant," however, there may be some instances where a plaintiff may allege scienter as to a corporate defendant without also alleging scienter as to an individual defendant.  *Id*.; *Vining v. Oppenheimer Holdings Inc*., No. 08 Civ. 4435 (LAP), 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010) ("[A] plaintiff can raise an inference of corporate scienter by establishing scienter on behalf of an employee who acted within the scope of his employment.") (internal citation omitted).  "A strong inference of corporate scienter may also be appropriate 'where a corporate statement is so important and

17

dramatic that it would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'" *In re Gentiva Secs. Litig.*, 932 F. Supp. 2d 352, 384 (S.D.N.Y. 2013) (citing *Vining*, 2010 WL 3825722, at *13).

A plaintiff may establish scienter by alleging facts that show either (1) that the defendant had the "motive and opportunity" to commit the alleged fraud, or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW*, 553 F.3d at 198; *see also, e.g., Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 574 (S.D.N.Y. 2012). When a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's conscious misbehavior or recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal citations omitted); *accord S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

Here, Plaintiff does not argue that Defendants had the "motive and opportunity" to commit fraud, and proceeds solely on the theory that Defendants acted with conscious misbehavior or recklessness. Opp. at 20. Conscious misbehavior "encompasses deliberate illegal behavior," and recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). To state a claim based recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information that they had a duty to monitor. *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012) (citing *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009)). "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension*

18

*Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309).

Moreover, corporate mismanagement does not constitute recklessness.  *Gissin v. Endres*, 739 F.

Supp. 2d 488, 514 (S.D.N.Y. 2010).

　　　Plaintiff seeks to establish that Northern Oil and Stoelk were reckless based on the

following representations of the CWs:  (1) that Reger came to Northern Oil headquarters three or

four days a week; (2) that Reger worked on Dakota Plains matters at Northern Oil facilities;

(3) that Reger had little to no involvement in the day-to-day operations at Northern Oil; and

(4) that individuals at Northern Oil including Stoelk knew that Reger ran Dakota Plains.

However, none of these allegations address whether Northern Oil and Stoelk were aware that

Reger acted illegally at Dakota Plains, whether he violated Northern Oil's Code of Business

Conduct and Ethics provisions concerning use of Northern Oil assets and conflict of interest, or

whether Reger improperly abdicated his responsibilities as CEO.  Indeed, it is unclear from

Plaintiff's allegations whether Northern Oil's relationship with Dakota Plains was collaborative

or created a conflict of interest.[6]  Furthermore, Plaintiff concedes that Reger worked on pursuing

acquisitions as Northern Oil's CEO.  CAC ¶ 64.

　　　There are also no allegations that Reger acted with recklessness sufficient to show that

Plaintiff sought to deceive Northern Oil shareholders.  Dakota Plains is alleged to be wholly

unrelated to Northern Oil, and the SEC settlement concerning Reger's failure to disclose his

control of Dakota Plains, which occurred after the Class Period, only implicated Reger in

negligent, not fraudulent, conduct.  *Id.* ¶¶ 5, 111.  Furthermore, Reger's alleged violations of the

---

[6] Indeed, Plaintiff states that Dakota Plains is a "wholly unrelated" transloading company while Northern Oil is a company engaged in the acquisition, exploration, development, and production of oil and natural gas properties, which suggests that there is no inherent conflict in working with the two.  CAC ¶¶ 2, 5, 29, 31, 83.  Moreover, Plaintiff alleges that Defendants represented that part of Northern Oil's success was due to its relationships with other companies.  *Id.* ¶¶ 81, 83.

Code of Business Conduct and Ethics and abdication of responsibility do not establish fraudulent intent as opposed to mere mismanagement. *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774, at *22 (S.D.N.Y. Sept. 30, 2016) (refusing to infer scienter based on an individual defendant's reckless abdication of his duties because it only amounts to mismanagement and poor governance, not securities fraud).

Plaintiff also argues that Reger engaged in conscious misbehavior by making false or misleading statements, and Stoelk engaged in conscious misbehavior by certifying the Form 10-Ks. The mere allegation that Defendants' disclosures were incomplete or that they omitted material information "is not enough to plead scienter based on conscious misbehavior or recklessness." *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 24 (S.D.N.Y. 2016), *appeal withdrawn* (June 7, 2016).

Viewing all of Plaintiff's allegations as a whole, the inference of scienter is not "as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Defendants may not have disclosed Reger's uncharged involvement with Dakota Plains because there was no reason to believe that Reger's conduct was improper when Defendants made the disclosures, and because Reger believed during the Class Period that the success of Dakota Plains would benefit Northern Oil investors. Doc. 44 at at 6; Doc 45 at 10. Indeed, when Reger received a Wells Notice from the SEC, Northern Oil terminated him, which undermines scienter. *See City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014) (the fact that the defendant commenced an internal investigation tends to undermine any inference of scienter.)

**B.  Section 20(a)**

Section 20(a) of the Exchange Act provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

Defendants argue that because a claim under Section 20(a) is predicated on a primary violation of securities law, the Section 20(a) claims must be dismissed.  Doc. 37 at 19.  It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation.  *See, e.g., In re eSpeed, Inc. Sec. Litig*., 457 F. Supp. 2d 266, 297-98 (S.D.N.Y. 2006)) (in the absence of a primary violation, "control person" liability under Section 20(a) cannot exist).  In light of Plaintiff's failure to adequately plead a primary violation, the Section 20(a) claims against the Defendants cannot stand.  Accordingly, the Court dismisses Plaintiff's Section 20(a) claim.

**C.  Leave to Amend**

In his Opposition, Plaintiff requested the opportunity to amend in the event the Court determined the allegations were insufficient to state a claim.  Opp. at 24.  A court may deny leave to amend a complaint for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  A court may deny a motion to amend on the basis of futility "only where no colorable grounds exist to support the proposed claim."  *Allison v. Clos-ette Too, L.L.C.*, No. 14 Civ. 1618 (LAK) (JCF), 2015 WL 136102, at *2 (S.D.N.Y. Jan. 9, 2015).  In *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo*

*Sec., LLC*, the Second Circuit reaffirmed that the "liberal spirit" of Federal Rule of Civil Procedure 15 embodies a "strong preference for resolving disputes on the merits." 797 F.3d 160, 190–91 (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011)). This is especially true, the Second Circuit explained, for a case involving "a complex commercial reality with a long, multi-prong complaint" that has not had "the benefit of a ruling" that highlights "the precise defects" of the complaint. *Id.* As Plaintiff has not previously had the benefit of a ruling highlighting the precise defects of its complaint, he will be given the opportunity to amend.

## IV.  Conclusion

For the aforementioned reasons, the Defendants' motion to dismiss is GRANTED without prejudice. If Plaintiff chooses to amend the CAC, he must do so by **Thursday, January 25, 2018**.

The Clerk of the Court is respectfully directed to terminate the motion, Docs. 36, 38, 46. It is SO ORDERED.

Dated:    January 10, 2018
          New York, New York

                                          Edgardo Ramos, U.S.D.J.