**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY FRIES, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN OIL AND GAS, INC., MICHAEL L. REGER, and THOMAS W. STOELK,<br><br>Defendants. | No. 16 Civ. 6543 (ER)(AJP)<br><br>Honorable Edgardo Ramos<br><br><u>CLASS ACTION</u><br><br>**CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff Matthew Atkinson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his consolidated second amended complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Northern Oil and Gas, Inc. ("Northern Oil" or the "Company"), analysts' reports and advisories about the Company, the statements of Confidential Witnesses ("CWs"), the SEC's Order Making Findings and Imposing a Cease-And-Desist Order (the "Order") against defendant Michael L. Reger ("Reger") in *In the Matter of Michael L. Reger, Respondent*., Release No. 10241 (Oct. 31, 2016),[1] and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations

---

[1] Publicly-available at https://www.sec.gov/litigation/admin/2016/33-10241.pdf

set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Northern Oil securities between March 1, 2013 and August 15, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Northern Oil is an independent energy company engaged in the acquisition, exploration, development, and production of oil and natural gas properties in the United States. The Company primarily holds interests in the Bakken and Three Forks formations in the Williston Basin of North Dakota and Montana.

3. Northern Oil is headquartered in Minnetonka, Minnesota. The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NOG."

4. Defendant Reger co-founded Northern Oil in 2006 at the age of 30 and has played an outsized role in the Company's business throughout its history. In a 2008 profile in the online edition of Minnesota's *Star Tribune* newspaper, Reger stated that his "family history in oil and gas dates to the 1930s" and that he has "been involved in the acquisition of land, oil and gas leases my entire professional life. . . I am the fourth generation in my family to be in the oil and gas business." As described *infra* at ¶¶96-139, during the Class Period, Northern Oil and Reger framed Reger's family history and personal leadership as essential to the Company's success and prospects. In 2012 and 2013, Forbes named Reger one of "America's Most Powerful CEOs 40 and Under."

5. Both before and during the Class Period, and unbeknownst to Northern Oil investors, Reger, along with his Northern Oil co-founder Ryan Gilbertson ("Gilbertson"), was a major investor in and exercised total control over a separate oil transport company, Dakota Plains Holdings, Inc. ("Dakota Plains"), despite never holding any formal position at Dakota Plains.

6. In exercising this control, Reger neglected his duties as CEO of Northern Oil, misappropriated Company resources – including Company stock – in the service of his co-extensive role at Dakota Plains, and implicated himself in potential conflicts of interest.

7. At all relevant times, Reger flaunted his role as a shadow chief executive officer, so much so that it was common knowledge at Northern Oil's headquarters, in no small part due to the fact that Reger conducted much of his Dakota Plains-related business there, in plain sight, misdirecting Company resources in the process.

8. Worse, once Dakota Plains went public, Reger's actions rose to the level of criminal activity likely to result in prosecution and/or adverse consequences for Northern Oil, which trumpeted Reger's indispensability in its public statements and filings.

9. During the Class Period, the number of employees at Northern Oil's headquarters hovered in the low double digits, making the Company a small, tight-knit operation with few secrets.

10. While Reger was affirmatively obligated under the Exchange Act to report his beneficial ownership of Dakota Plains at all times during the Class Period, he instead hid his stake in that company through multiple nominee accounts.

11. More nefariously, Reger and his co-conspirator directed their handpicked CEO at Dakota Plains to issue promissory notes in conjunction with its public stock offering. The notes

had an escalator clause that paid noteholders a bonus based on Dakota Plains' stock price during its first twenty days of trading. The shares quickly jumped to $12, stayed at or near that price for twenty days, and then suspiciously declined, never to reach that level again. The parties to this scheme reaped a windfall of nearly $33 million on $9 million in outstanding promissory notes.

12. Neither the aforementioned conduct nor any system of internal controls was adequate to motivate the Company to take any action against Reger, other than to dramatically increase his salary, even though Northern Oil's revenue had decreased in equally dramatic fashion. This was true in spite of the fact that Reger's behavior directly contravened the Company's own Code of Business Conduct and Ethics, which was disseminated to shareholders and cited in the Company's public filings, even though the SEC began an investigation into stock manipulation at Dakota Plains that was publicly reported in 2015, and even though Company employees helped Reger to perpetuate the fraud

13. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) Reger's conduct violated the Company's assurance to investors that executives would maintain honest conduct and adhere to applicable laws and regulations; (iii) Reger's blatant misuse of Company assets violated the Company's commitment to investors to safeguard those assets for legitimate purposes; (iv) Reger's open (but non-public) involvement in running a second oil industry business violated the Company's prohibition of conflicts of interests as communicated to

investors; (v) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (vi) Reger was unfit to serve as Northern Oil's CEO; (vii) Northern Oil's stated dependence on Reger caused it overlook his flagrant ethical and legal violations; (viii); Reger's ethical and legal violations were common knowledge at Northern Oil long before the SEC's investigation; and (iv) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

14. On April 16, 2016, an article published in the *Star Tribune* implicated Reger in stock manipulation at Dakota Plains.

15. As a result, Northern Oil stock fell $0.41, or 9.14%, to open at $4.37 on the next trading day, April 18, 2016.

16. Following the *Star Tribune*'s partial revelation of Reger's activities at Dakota Plains, the Company disclosed, in two quarterly filings between May and August of 2016, that it had spent $500,000 on legal fees in conjunction with its participation in the SEC's investigation of Dakota Plains.

17. The May-August 2016 disclosures were misleading because, among other things, they falsely characterized Reger as a mere "initial investor" in Dakota Plains and downplayed the Company's role with respect to Dakota Plains, a company that was built – in its public iteration – with Northern Oil personnel and resources. In addition, Northern Oil employees, including Reger, were directly involved in the stock manipulation scheme at Dakota Plains.

18. On August 16, 2016, Northern Oil fired Reger as CEO, allegedly after Reger told the Company that he had received a Wells Notice from the SEC and faced federal sanctions in connection with the SEC's investigation of 2012 trading patterns in the securities of Dakota

Plains.[2] Northern Oil stated that Reger had been removed from the Company's board, effective immediately, and that the Company did not believe that Reger would be entitled to any severance payment.

19. On this news, Northern Oil stock fell $0.25, or 6.28%, to close at $3.73 on August 16, 2016.

20. On October 31, 2016, it was announced, via the Order, that Reger had settled with the SEC for approximately $8 million, which included repayment of $6.5 million in "ill-gotten gains," while Gilbertson, his co-conspirator, contested the charges and was eventually indicted.

21. Reger remains under threat of further payouts as a defendant in a lawsuit filed by Dakota Plains investors in connection with the fraud discussed herein.

22. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company's shares trade on the NYSE, located in this District.

[2] A Wells Notice is a letter from the SEC advising a person or a firm that the SEC intends to bring an enforcement action against them.

26. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

27. Plaintiff, as set forth in the Certification submitted in connection with his motion to be appointed Lead Plaintiff (ECF No. 6), acquired Northern Oil securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

28. Defendant Northern Oil is incorporated in Minnesota, and the Company's principal executive offices are located at 601 Carlson Parkway, Suite 990, Minnetonka, Minnesota.

29. Defendant Michael L. Reger served as the Company's Chief Executive Officer ("CEO") from 2007 until his termination on August 16, 2016, and is presently its Chairman Emeritus. At the time when Dakota Plains' stock commenced public trading, Reger controlled 21.4% of Dakota Plains' stock and 33.3% of its promissory notes. Reger had an affirmative legal obligation under Sections 13(d) and 16(a) of the Exchange Act to report his beneficial ownership of Dakota Plains at all times during the Class Period, but instead hid his ownership through multiple nominee accounts. Reger sold over 550,000 shares of Northern Oil common stock during the Class Period. Reger previously passed the Series 7, 63, and 65 licenses exams and is well versed in securities regulations and beneficial ownership reporting requirements.

30. Non-party Ryan R. Gilbertson served as President of Northern Oil from its inception and resigned unexpectedly in October 2012. At the time Dakota Plains went public

through a reverse merger, Gilbertson controlled 11% of Dakota Plains' stock and 38.9% of its promissory notes. Gilbertson had an affirmative legal obligation under Sections 13(d) and 16(a) of the Exchange Act to report his beneficial ownership of Dakota Plains at all times during the Class Period, but instead hid his ownership through multiple nominee accounts. On March 23, 2017, Gilbertson was charged by a federal grand jury in Minnesota with thirteen counts of wire fraud.

31. Defendant Thomas W. Stoelk ("Stoelk") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and as the Company's interim CEO since Defendant Reger's termination. Stoelk sold over 78,000 shares of Northern Oil common stock during the Class Period.

32. Non-party Dakota Plains is a Nevada corporation with its principal executive offices in Wayzata, Minnesota. It purported to run a "transloading" facility that was supposed to load crude oil onto railroad cars in New Town, North Dakota. All aspects of its business were performed by subsidiary LLCs, making it nearly impossible to determine the true sources of the revenue Dakota Plains reported and its customer base, and whether those customers were in any way related parties to Gilbertson and Reger, or their friends and associates. Dakota Plains is currently in Chapter 11 bankruptcy proceedings.

33. The Defendants described in ¶¶29 and 31 are sometimes hereinafter referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## Background

### The Founding of Northern Oil and Dakota Plains

34. Northern Oil is an independent energy company purportedly engaged in the

acquisition, exploration, development, and production of oil and natural gas properties in the United States. The Company primarily holds interests in the Bakken and Three Forks formations in the Williston Basin of North Dakota and Montana.

35. Defendant Reger co-founded Northern Oil in 2006 in Wayzata, Minnesota with Gilbertson. In a subsequent wrongful termination lawsuit filed against Northern Oil, Reger claimed to have "built" the Company and "protected" it by instituting a hedging strategy to take effect in the event of declines in the price for oil, upon which the Company was highly dependent. In an October 2012 statement to the *St. Paul Pioneer Press*, Northern Oil spokesman Erik Nerhus agreed that Reger (and Gilbertson) had "built this machine."[3]

36. The public trading of Northern Oil began in 2007 by virtue of a "reverse merger," whereby a company goes public by merging into a shell company – in this case Kentex Petroleum Inc. – that has little more than a publicly-traded stock. Reverse mergers have proven uniquely fraud-prone: by stepping into the shoes of the shell companies, reverse merger entities have successfully avoided the scrutiny the SEC normally applies to companies seeking access to the public markets, often foreshadowing disaster for investors.[4]

37. In 2008, not long after they co-founded Northern Oil, Reger and Gilbertson again teamed up to co-found Dakota Plains' predecessor, Dakota Plains Transport Inc., which became Dakota Plains Inc., and after a March 22, 2012 reverse merger with a publicly-traded shell company, ultimately became Dakota Plains Holdings, Inc. At the time Dakota Plains went public, Gilbertson was still the President of Northern Oil.

---

[3] *See* Leslie Brooks Suzukamo, "Wayzata's Northern Oil & Gas fires chief operating officer." *St. Paul Pioneer Press* (Oct. 16, 2012), publicly-available at: https://www.twincities.com/2012/10/16/wayzatas-northern-oil-gas-fires-chief-operating-officer/

[4] *See* Francine McKenna, "After China fraud boom, Nasdaq steps up scrutiny of shady listings." *MarketWatch* (June 20, 2016), publicly-available at: http://www.marketwatch.com/story/after-china-fraud-boom-nasdaq-steps-up-scrutiny-of-shady-listings-2016-06-20

38. Reger and Gilbertson caused Dakota Plains to issue them each millions of founder shares and to issue additional founder shares to their friends and family members. Reger made only a nominal capital investment in Dakota Plains, but he lent the company a total of $120,000 in 2008 and 2009 as partial funding for the acquisition of land in North Dakota for a rail facility.

39. To avoid disclosing the full extent of their involvement with Dakota Plains, Reger and Gilbertson named their fathers as CEO and President, respectively. The fathers, however, were mere figureheads, and Reger and Gilbertson made all material decisions for Dakota Plains.

40. Between March 2009 and December 2011, Reger and Gilbertson caused Dakota Plains to conduct four private placements of its stock, through which Dakota Plains raised more than $7 million from investors. Reger personally encouraged some of the investors to purchase stock in the private placements. Among other things, the proceeds of the private placements were used to repay the initial loans Reger made to Dakota Plains, plus 12% interest. None of the offering materials for any of the private placements disclosed any involvement of Reger in the management or control of Dakota Plains or identified him as having loaned any money to the Company.

**<u>Reger's Violations of the Securities Laws at Dakota Plains</u>**

41. In January 2011, just over a year before Dakota Plains went public, Reger and Gilbertson caused Dakota Plains to issue $3.5 million in 12% promissory notes ("Senior Notes"). Reger and Gilbertson, along with their nominees, purchased $2.1 million of those Senior Notes. Rather than use the money to build out the crude oil transloading facility Dakota Plains was purportedly to operate, Gilbertson and Reger caused Dakota Plains to use the majority of the proceeds from the Senior Notes to pay a shareholder dividend, including a $439,000 dividend to

a LLC controlled by Reger, $288,500 to Gilbertson and $157,000 to Gilbertson's then-wife, Jessica Gilbertson. Thereafter, in April 2011, Reger and Gilbertson caused Dakota Plains to issue another $5.5 million of promissory notes, at a 12% annual interest rate ("Junior Notes"). Reger, Gilbertson and the entities they controlled purchased $4.25 million of the $5.5 million of the Junior Notes which were issued.

42. Reger and Gilbertson appointed Gabriel G. Claypool ("Claypool") CEO and Director of Dakota Plains in February 2011. Among other perks, Reger and Gilbertson provided Claypool with additional secret benefits in the form of stock in Northern Oil as well as a loan from another entity controlled by Reger and Gilbertson. Claypool was ultimately replaced as CEO of the Company in February 2013, but continued as a member of Dakota Plains' Board of Directors and as its Chief Operating Officer.

43. In October 2011, Gilbertson directed Dakota Plains to consolidate the Senior Notes and Junior Notes into a single series of Consolidated Notes. Reger was aware of and acceded to the decision. Reger and his LLC then transferred their $3 million of Consolidated Notes to Reger's two minor children. Although Reger named his brother as custodian for the minor children, in reality, Reger maintained control over his children's Consolidated Notes.

44. Gilbertson directed Dakota Plains (via Claypool) to include an "additional payment" provision in the Consolidated Notes. Under that provision, the noteholders would receive bonus payments based on the average price of Dakota Plains' stock in its first twenty days of public trading. The noteholders would receive bonus payments if the average price exceeded $2.50, and the amount of the bonus payments increased as the average stock price increased. Reger was aware of and acceded to the inclusion of the "additional payment" provision.

45. Upon becoming a publicly traded Company at the direction of Reger and Gilbertson on March 22, 2012, the price of Dakota Plains stock almost immediately jumped to $12, and it stayed between $11 and $12 for almost exactly twenty days. Trading during that twenty-day period was extremely light, with the volume after the opening day never exceeding 2,300 shares per day.

46. On the first day of public trading, Reger notified Dakota Plains he was converting all 1,000,000 warrants he received with the Senior Notes. Those warrants contained a cashless conversion feature based on a reference date three days after the notice of conversion. As a result of Dakota Plains stock closing at $11.01 on the reference date, Reger received 974,114 shares in the conversion.

47. On May 15, 2012, Dakota Plains filed a Form 10-Q disclosing that, as a result of the average stock price in the first twenty days, the holders of the $9 million in Consolidated Notes were entitled to receive notes or stock worth $32,851,800 pursuant to the additional payment provision. However, the Form 10-Q did not identify Reger and Gilbertson as the main beneficiaries of this windfall.

48. Reger elected to have his children take their additional payment in the form of $10,950,600 of new promissory notes (the "Additional Payment Notes"). Following Dakota Plains shareholder complaints, the additional payment was reduced and converted to equity in two restructurings. As a result of the restructurings, Reger's children received 2,245,344 shares of Dakota Plains for their additional payment. Dakota Plains also paid Reger's children $1,659,133 in interest under the Consolidated Notes and Additional Payment Notes.

49. After the twenty-day period ended, Dakota Plains' stock price never again approached $12 and soon traded at or below the last privately offered price. It ended 2012

trading between $3 and $4 per share. By the end of 2013, the stock traded between $2 and $3 per share. By mid-2015 it was trading for less than a dollar. In July 2016 the stock was delisted from the NYSE MKT on which it had been trading. Dakota Plains declared Chapter 11 bankruptcy on December 16, 2016. The Company's stock is now worthless.

50. Reger transferred shares he controlled to his children and a family foundation; in reality, however, Reger was the beneficial owner of all of these shares and warrants.

51. Reger purposefully structured his Dakota Plains holdings so that no one account held more than 5% of Dakota Plains' stock. Reger transferred shares he controlled to his children and family foundation. When Dakota Plains went public, Reger held shares and warrants under ten different names. He held 1,000,000 warrants in his own name, 776,700 shares in a family foundation, and 6,511,580 shares in the names of his two minor children spread among eight separate accounts with four different family members, other than Reger himself, named as custodians.

52. The custodians, however, did not control the children's shares. Instead, Reger himself made all of the investment and voting decisions for all eight of the children's accounts. At times he stamped, signed, or caused to be stamped or signed the custodians' signatures on documents to vote the children's shares or effectuate transactions in their accounts.

53. Reger thereby intentionally hid his involvement with Dakota Plains from investors. Reger beneficially owned approximately 21.4% of the Company's stock when it went public, divided between ten different accounts he controlled in different names to illegally avoid the public disclosure requirements of Sections 13(d) and 16(a). Disclosure thereof, including but not limited to the fraud committed, would have been a material fact to public investors and

materially influenced their decisions to invest in Northern Oil, including the price at which they would make such an investment, and whether or not to hold onto the stock.

54. On February 20, 2015, Dakota Plains sent the SEC a letter regarding Gilbertson's and Reger's violations of "Section 13(d) and Regulation 13D, Section 16(a), Market Manipulation and Deceptive Practices Rules under Section 10(b)-5 and 18, Insider Trading Rules under Section 10(b)-5, and Regulation FD." The existence of this letter sent to the SEC and the SEC investigation itself was omitted from all of Dakota Plains' SEC filings during the Class Period, and was likewise not disclosed by Reger, despite his being a control person of Dakota Plains.

55. As discussed below, at all relevant times Reger's status as a major investor in and control person of Dakota Plains was known at Northern Oil, which was located half a block from Dakota Plains' offices in Wayzata.

56. Northern Oil – and by extension its internal controls – proved repeatedly incapable of internally enforcing the Code of Business Conduct and Ethics it told investors was among its core tenets, and which prohibited dishonest, unethical dealings; misuse of Company resources; and unsanctioned conflicts of interest.

57. While working at Northern Oil headquarters in Wayzata, Reger neglected his responsibilities as CEO and brazenly appropriated Company resources, including Company stock and employee time and labor, in furtherance of his control of Dakota Plains. Yet in spite of the obvious discrepancy between this behavior and the fact that Reger had no formal role at Dakota Plains, no action was taken by the Company.

58. Instead, Reger in 2015 received a 151 percent pay increase from 2014, from $3.8 million annually to $9.5 million annually, in spite of the fact that Northern Oil's revenue

declined 75% year-over-year in the same period.

**Confidential Witnesses**

**CW1**

59. Confidential Witness (CW) 1 worked as an Executive Assistant at the Northern Oil & Gas headquarters in Wayzata from January 2009 through September 2015. CW1 reported directly to Reger, and interacted with him extensively in the course of CW1's duties.

60. CW1 stated, with respect to Reger, that other people ran the Company while Reger was the face of the Company, and that Reger was at Northern Oil headquarters three or four days a week, but only briefly. Relatedly, CW1 stated that during his last few years at Northern Oil, the Company's CFO, Stoelk effectively ran the Company.

61. CW1 further stated that despite being one of the Company's original five employees, he did not recall ever hearing about a Company code of ethics.

62. CW1 went on to explain that there were numerous instances where Reger worked on non-Company matters at Northern Oil headquarters, including work on Dakota Plains. According to CW1, Reger would hold meetings at the headquarters that pertained to Dakota Plains, not Northern Oil.

63. Moreover, CW1 stated that in his capacity as Northern Oil employee, he regularly ferried Dakota Plains-related personnel, including Dakota Plains directors and investors, to and from Northern Oil headquarters.

64. CW1 stated that Reger would use Company-sponsored tours of Northern Oil facilities in North Dakota to pitch hedge funds and other investment entities on Dakota Plains.

65. According to CW1, it would have been difficult for anyone at Northern Oil not to be aware that Reger and Gilbertson were using Northern Oil's resources to grow a separate

venture.

66. For example, Northern Oil lawyers were engaged by Company insiders to draw up the papers associated with taking Dakota Plains public.

67. The Northern Oil attorneys who drew up the documents were former Northern Oil General Counsel James Sankovitz ("Sankovitz"), who was promoted to Chief Operating Officer ("COO") in March 2010, and Northern Oil attorney Stephanie Horton ("Horton"), who is still employed by Northern Oil in the same position.[5] CW1 stated that Sankovitz and Horton began devoting time to producing Dakota Plains documents around 2010.

68. In fact, according to CW1, any and every document ever written up for Dakota Plains was done by Northern Oil lawyers because Dakota Plains didn't have any lawyers of their own at this time.

69. CW1 also stated that Dakota Plains shares were purchased under the names of Northern Oil employees, while Gilbertson maintained control of those shares.

70. CW1 recalled that in the run-up to Dakota Plains' market debut in March 2012, Reger, Gilbertson, and Sankovitz began spending much of their time at Northern Oil's offices preparing to take Dakota Plains public.

71. Reger's relationship to Dakota Plains was widely-known within Northern Oil, CW1 said, citing the fact that Northern Oil lawyers handled the proceedings to take Dakota Plains public, and that those meetings happened in the Northern Oil board room.

72. CW1 estimated that half of Northern Oil's approximately twenty-five employees, including CW1, were frequently called upon to perform tasks that benefitted Dakota Plains, not Northern Oil, starting in 2009-2010. These employees all continued to receive paychecks drawn

[5] On October 16, 2012, Northern Oil terminated Sankovitz's employment as COO, purportedly because it no longer needed a COO.

from the funds of Northern Oil, however.

73. CW1 stated that all of Northern Oil's board members were directly aware that Northern Oil employees, resources, and time were misallocated to benefit Dakota Plains.

74. CW1 was aware that the promissory notes issued by Dakota Plains in 2011 were held in the names of Northern Oil's executives, as well as their friends and family members.

75. Reger managed to obfuscate his stake in Dakota Plains by routing money through multiple nominee accounts, CW1 recalled.

76. CW1 learned directly from Reger that the two largest stockholders at Dakota Plains were Reger's children.

77. Northern Oil employees were also solicited to allow their identities to be used to obscure the true ownership of the promissory notes, CW1 stated.

78. For example, CW1 stated that Northern Oil's former CFO, Chad Winter, stepped down due to pressure on Northern Oil employees to buy shares of related non-Northern Oil companies, including Dakota Plains.

79. CW1's own involvement included being given binders containing all of the Dakota Plains promissory notes and related documents. CW1 was then instructed by Reger and Gilbertson to haul the binders back and forth from Northern to Dakota Plains on multiple occasions, and personally interacted with Claypool and Dakota Plains CFO Tim Brady in the course of these trips.

80. CW1 said that he personally delivered documents drawn up by Northern Oil lawyers, led by Sankovitz, to the Dakota Plains office at least a couple times each week in the run-up to Dakota Plains going public.

81. CW1 explained that, initially, the fathers of Reger and Gilbertson were drawn up as the CEO and President of Dakota Plains. Gilbertson's father lived locally and he never came to the Northern Oil office because it was inconvenient for him, necessitating CW1 to drive the paperwork out to get signatures. Some of the documents among the paperwork authorized shares for different people affiliated with Northern Oil. Prior to 2010, Dakota Plains did not have its own office, meaning that to the extent it used company facilities, it used Northern Oil's.

82. CW1 stated that he was contemporaneously aware that Reger, Gilbertson and their associates benefitted substantially from the Dakota Plains stock offering, including celebrations in the Northern Oil offices at the time Dakota Plains went public in 2012.

83. CW1 also stated that around the same time, Defendant Stoelk demonstrated awareness of the amount of non-Northern Oil-related business being conducted at Northern Oil's offices, though no action against Reger was taken.

84. CW1 further stated that he was privy to conversations between Gilbertson and Reger at Northern Oil in which they discussed their purposeful failure to disclose their controlling interest in Dakota Plains.

**CW2**

85. CW2 worked as a Vice President of Engineering at the Northern headquarters in Wayzata from November 2011 through May 2015. CW2 reported directly to the Company's CFO, Defendant Stoelk, and Defendant Reger, with whom he met two or three times every day.

86. CW2 stated that Reger's role at Northern Oil was not well defined; Reger had little to no involvement in day-to-day operations at the Company and spent the majority of his time pursuing acquisitions or occupied with matters relating to Dakota Plains.

87. CW2 attested to a contemporaneous belief that Reger was, in fact, running Dakota

Plains, and stated that Reger's role at Dakota Plains was widely known at Northern Oil headquarters.

88. Based on his first-hand interactions with Defendant Stoelk, CW2 stated that Stoelk shared CW2's understanding that Reger ran Dakota Plains.

**CW3**

89. CW3 worked as a Vice President of Operations for Dakota Plains in Wayzata from April 2012 to February 2013. At Dakota Plains, CW3 reported directly to Claypool.

90. CW3 stated that he was interviewed by Reger and Gilbertson for his position, despite Reger's not being an executive, or even an employee, of Dakota Plains.

91. CW3 also stated that immediately prior to being tapped to serve as CEO of Dakota Plains, Claypool worked as an account representative at an AT&T store, and that Claypool's qualification for the position was that he had been college roommates at Iowa State University with the son of one of the original Northern Oil shareholders.

92. CW3 described Claypool's demotion from CEO to Chief Operating Officer and director as a function of Reger's frustration with Dakota Plains' falling stock. According to CW3, Claypool was a puppet for Northern Oil, the offices of which were short walk away

93. CW3 recalled spending more time in Northern Oil's offices than Dakota Plains' own offices, and went on to state that Dakota Plains functioned under the direction of Northern Oil, with Reger calling the shots and getting everything that he wanted. Claypool, as CEO, served as an intermediary between Northern Oil and Dakota Plains to avoid Reger being implicated in illegal insider trading activity.

94. Further complicating the relationship between Reger and Dakota Plains' inexperienced CEO was a personal or business loan in excess of $100,000 between Reger and

Claypool. Claypool used the loan to place a down payment on an expensive home, CW3 said, and Reger used the threat of sudden, full repayment of the loan's principal to control Claypool.

95. CW3 stated that the nexus between Northern Oil and Dakota Plains was such that when Northern Oil received positive news, impromptu celebrations were held at Dakota Plains' offices.

**Materially False and Misleading Statements Issued During the Class Period**

96. The Class Period begins on March 1, 2013, when Northern Oil filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2012 (the "2012 10-K"). In the 2012 10-K, Northern Oil stated, in part:

> ***Directors, Executive Officers, and Corporate Governance***
>
> . . .
>
> We have adopted a Code of Business Conduct and Ethics that applies to our chief executive officer, chief financial officer and persons performing similar functions. A copy is available on our website at www.northernoil.com. We intend to post on our website any amendments to, or waivers from, our Code of Business Conduct and Ethics pursuant to the rules of the SEC and NYSE MKT.

97. At all relevant times, the Company's Code of Business Conduct and Ethics, effective as of November 30, 2007, publicly-available in the "Investor Relations" section of the Company's website, and incorporated by reference in the Company's 2012 10-K, has stated, in part:

> **Business Ethics**
> It is the policy of the Company that all employees and directors comply strictly with all laws governing its operations and to conduct its affairs in keeping with the highest moral, legal and ethical standards. ***In particular, senior executives hold an important and elevated role in maintaining a commitment to (i) honest and ethical conduct***; (ii) full, fair, accurate, timely and understandable disclosure in the Company's public communications, and (iii) compliance with applicable government rules and regulations.

. . .

**Illegal or Unethical Behavior**
The Company proactively promotes ethical behavior. Employees should report violations of applicable laws, rules and regulations, this Code or any other code, policy or procedure of the Company to appropriate personnel. Officers of the Company should report any such violation directly to the chief executive officer and/or the chief financial officer. Employees and directors are expected to cooperate in internal investigations of misconduct.

…

**Protection and Proper Use of Company Assets**
All employees and directors should protect the Company's assets and ensure their efficient use. All Company assets should be used for legitimate business purposes only. The use of assets of the Company for any unlawful or improper purpose is strictly prohibited. Theft, carelessness, and waste have a direct impact on the Company's profitability.

…

**Conflicts of Interest**
A conflict of interest exists where one or both parties in a relationship receive or give unfair advantage of preferential treatment because of the relationship and the term "conflict of interest" describes any circumstance that could cast doubt on a person's ability to act with total objectivity with regard to the Company's interest. Conflicts of interest are prohibited as a matter of Company policy …. All employees must conduct business in a manner that avoids even the appearance of conflict between personal interests and those of the Company.

…

Also, employees are prohibited from directly or indirectly competing, or performing services for any person or entity in competition with, the Company.

(Emphasis added.)

98. The Company, in the 2012 10-K, also stated that:

To continue to develop our business, we rely on our management team's knowledge and expertise in the industry and will use our management team's relationships with industry participants, ***specifically those of Mr. Reger our Chief Executive Officer***, to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual arrangements with other oil and natural gas companies.

99. The 2012 10-K further touted Reger's personal pedigree as follows:

> *Michael L. Reger* is a founder of our predecessor, Northern Oil and Gas, Inc., and has served as Chairman of the Board and Chief Executive Officer of our company since March 2007. ***Mr. Reger has been involved in the acquisition of oil and gas mineral rights for his entire career***. Mr. Reger began working the oil and gas leasing business for his family's company, Reger Oil, in 1992 and worked as an oil and gas landman for Reger Oil from 1992 until co-founding Northern in 2006. Mr. Reger holds a B.A. in Finance and an M.B.A. in finance/management from the University of St. Thomas in St. Paul, Minnesota. ***The Reger family has a history of acreage acquisition in the Williston Basin dating to 1952***. (Emphasis added.)

100. Reger and Stoelk signed the 2012 10-K, which contained false and misleading statements, as well as accompanying certifications which falsely certified that the 2012 10-K "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

101. The statements referenced in ¶¶96-100 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) Reger's conduct violated the Company's assurance to investors that executives would maintain honest conduct and adhere to applicable laws and regulations; (iii) Reger's blatant misuse of Company assets violated the Company's commitment to investors to safeguard those assets for legitimate purposes; (iv) Reger's open (but non-public) involvement in running a second oil industry business violated the Company's prohibition of conflicts of interests as communicated

to investors; (v) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (vi) Reger was unfit to serve as Northern Oil's CEO; (vii) Northern Oil's stated dependence on Reger caused it overlook his flagrant ethical and legal violations; and (viii) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

102. On August 14, 2013, Reger presented on behalf of Northern Oil at EnerCom: The Oil & Gas Conference in Denver, Colorado. During his presentation, Reger emphasized his own importance to the Company:

> ***I'm a fourth generation landman in the Williston Basin. Northern Oil & Gas started acquiring leases in Mountrail County in June of 2006, so about seven years ago. I won't tell you what we have at hand, but it was pretty well at that time***. So we have low acreage cost and strong all-in returns because we got an early start. Northern really had an important time and place advantage in the Williston because we got to build our acreage position in the core of the play early and then we got to drill with EOG and Slawson and Continental and others on east of the Nesson anticline and on the Nesson anticline back starting in 2007. And then it started moving west of the Nesson anticline in 2009.
>
> So, we built an important position in the core of the play early at a low cost. And we participated in some of the first Bakken wells. We were in the first – probably one of the first four or five Bakken wells that EOG drilled in the Parshall Field in 2007. So we had a real early start here.
>
> On-the-ground advantages, it's really strategic non-operated acreage acquisitions in the Bakken core. Most of you know it's pretty tough to pick up an operatable position in the Williston Basin without buying another company or you've seen some larger transactions here in the last couple of months where operators are acquiring other operatable interests. But for us, there's a tremendous amount of non-operated opportunity that surrounds operators selling Northern interest in other operators' wells, folks selling interests because they might not be able to meet their cash calls. And Northern, as the largest non-operator in the Williston, really stands alone now as really the buyer of record for non-operated interests. And we really are the first call for sellers who are looking to divest their interests for whatever reason. (Emphasis added.)

103. The statements referenced in ¶102 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (iii) Reger was unfit to serve as Northern Oil's CEO; and (iv) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

104. On October 2, 2013, Reger presented on behalf of Northern Oil at the Independent Petroleum Association of America's Oil and Gas Investment Symposium in San Francisco, California. During his presentation, Reger emphasized his own importance to the Company:

> ***I'm a fourth generation land man in the Williston Basin which is one of the advantages we had back in 2006 when we started leasing***. We really knew what was happening on the ground in Mountrail County when EOG hit that first well in Mountrail County in May of 2006. So we have brokers on the ground basically within days of that discovery.
>
> So we are pure-play Williston Basin operator or non-operator and participant, and we will continue to be a non-operator in the Williston Basin. We are going to continue to exploit our competitive advantage in Basin. (Emphasis added.)

105. The statements referenced in ¶104 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (iii) Reger was unfit to serve as Northern Oil's CEO; and (iv) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

106. On October 17, 2013, Reger presented on behalf of Northern Oil at the Canaccord Genuity Global Resource Conference. During his presentation, Reger emphasized his own importance to the Company:

> ***And just we really have long-standing relationships with the leading operators and the landmen in the field. I'm a fourth-generation landman in the Williston Basin, so really we know the players out there. We've been working with them for many decades.*** We've got a really nice niche in what we do.
>
> And really, one thing that's been important is the relationship that we do have with our operators is great for us because we're able to do more deals with those operators. We are a source of when an operator does want to divest non-operated interest in another operator as well, we believe we're the first call for those operators. So those relationships are important to us as well. (Emphasis added.)

107. The statements referenced in ¶106 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) consequently, and

as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (iii) Reger was unfit to serve as Northern Oil's CEO; and (iv) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

108. On November 12, 2013, Reger presented on behalf of Northern Oil at the Jefferies Global Energy Conference in Houston, Texas:

> Continuous opportunity stream from various sources, again, lot of acres we're picking up on the ground from the land folks. ***I'm a fourth generation land man in the Williston. We kind of know all the players, we know all the dirt roads, we know where all the pheasants hide, we pretty much know everything about North Dakota.***
>
> So, we've kind of been the clearinghouse for non-operated interest for a long time now, really about little over seven years. (Emphasis added.)

109. The statements referenced in ¶108 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (iii) Reger was unfit to serve as Northern Oil's CEO; and (iv) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times

110. On December 12, 2013, Northern Oil's Executive Vice President, Corporate Development and Strategy, Brandon Elliott ("Elliott") presented at Capital One Securities 8th

Annual Energy Conference. During his presentation, Elliott highlighted Defendant Reger's leadership as a key component of Northern Oil's success and business prospects:

> We currently have a strong reserve base. Pretty good equity value and enterprise value as you can see, indicated here at the bottom. Couple of things we think you should care about when you are looking at Northern. It is a very strong, defensible, non-op position in one of the leading oil plays in the U.S. ***We are obviously laser focused on transactions in the [Williston] basin. It's a basin where we have been since we started and have had with our co-founder, Mike Reger, a four generation advantage on the ground in this basin.*** So we clearly know where land deals are being done and where they are likely to be done in the future.
>
> ***We have built on that early mover advantage into this current position.***

(Emphasis added.)

111. The statements referenced in ¶110 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (iii) Reger was unfit to serve as Northern Oil's CEO; and (iv) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times

112. On March 3, 2014, Northern Oil filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K"). In the 2013 10-K, the Company stated, in part:

> ***Directors, Executive Officers and Corporate Governance***

. . .

> We have adopted a Code of Business Conduct and Ethics that applies to our chief executive officer, chief financial officer and persons performing similar functions. A copy is available on our website at www.northernoil.com. We intend to post on our website any amendments to, or waivers from, our Code of Business Conduct and Ethics pursuant to the rules of the SEC and NYSE MKT.

113. As described *supra* at ¶97 at all relevant times the Company's Code of Business Conduct and Ethics, incorporated by reference in the Company's 2013 10-K, described the Company's purported commitment to the promotion of ethical conduct by its officers, and highlighted "the important and elevated role" of its senior executives in "maintaining [that] commitment."

114. The Company, in the 2013 10-K, also stated that:

> To continue to develop our business, we rely on our management team's knowledge and expertise in the industry and will use our management team's relationships with industry participants, ***specifically those of Mr. Reger our Chief Executive Officer***, to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual arrangements with other oil and natural gas companies. (Emphasis added.)

115. The 2013 10-K further touted Reger's personal pedigree as follows:

> Michael L. Reger is a founder of our predecessor, Northern Oil and Gas, Inc., and has served as Chairman of the Board and Chief Executive Officer of our company since March 2007. ***Mr. Reger has been involved in the acquisition of oil and gas mineral rights for his entire career***. Mr. Reger began working the oil and gas leasing business for his family's company, Reger Oil, in 1992 and worked as an oil and gas landman for Reger Oil from 1992 until co-founding Northern in 2006. Mr. Reger holds a B.A. in Finance and an M.B.A. in finance/management from the University of St. Thomas in St. Paul, Minnesota. ***The Reger family has a history of acreage acquisition in the Williston Basin dating to 1952***. (Emphasis added.)

116. Reger and Stoelk signed the 2013 10-K, which contained false and misleading statements, as well as accompanying certifications which falsely certified that the 2013 10-K "d[id] not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

117. The statements referenced in ¶¶112-116 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) Reger's conduct violated the Company's assurance to investors that executives would maintain honest conduct and adhere to applicable laws and regulations; (iii) Reger's blatant misuse of Company assets violated the Company's commitment to investors to safeguard those assets for legitimate purposes; (iv) Reger's open (but non-public) involvement in running a second oil industry business violated the Company's prohibition of conflicts of interests as communicated to investors; (v) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (vi) Reger was unfit to serve as Northern Oil's CEO; (vii) Northern Oil's stated dependence on Reger caused it overlook his flagrant ethical violations; and (viii) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

118. On August 20, 2014, Reger presented on behalf of Northern Oil at EnerCom The Oil & Gas Conference in Denver, Colorado. During his presentation, Reger emphasized his own importance to the Company:

> We have a deep knowledge of the Williston Basin, Bakken, Three Forks. ***I'm a fourth generation landman from Billings, Montana. We know the play really, really well.*** We're the go-to non-op buyer in the field. If there's a non-op deal being divested or a small piece of acreage that is being sold, there's a very good chance Northern is going to have a look at it. (Emphasis added.)

119. The statements referenced in ¶118 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) Reger's conduct violated the Company's assurance to investors that executives would maintain honest conduct and adhere to applicable laws and regulations; (iii) Reger's blatant misuse of Company assets violated the Company's commitment to investors to safeguard those assets for legitimate purposes; (iv) Reger's open (but non-public) involvement in running a second oil industry business violated the Company's prohibition of conflicts of interests as communicated to investors; (v) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (vi) Reger was unfit to serve as Northern Oil's CEO; (vii) Northern Oil's stated dependence on Reger caused it overlook his flagrant ethical violations; and (viii) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

120. On November 12, 2014, Reger presented on behalf of Northern Oil at Jefferies Global Energy Conference in Houston, Texas. During his presentation, Reger emphasized his own importance to the Company:

> ***I'm a fourth-generation land man from the Williston***. So we know where the oil is and we know where the [indiscernible] … So we pretty much have the Williston locked down. (Emphasis added.)

121. The statements referenced in ¶120 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (iii) Reger was unfit to serve as Northern Oil's CEO; and (iv) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

122. On February 27, 2015, Northern Oil filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). In the 2014 10-K, Northern Oil stated, in part:

> ***Directors, Executive Officers, and Corporate Governance***
>
> . . .
>
> We have adopted a Code of Business Conduct and Ethics that applies to our chief executive officer, chief financial officer and persons performing similar functions. A copy is available on our website at www.northernoil.com. We intend to post on

our website any amendments to, or waivers from, our Code of Business Conduct and Ethics pursuant to the rules of the SEC and NYSE MKT.

123. As described *supra* at ¶97, at all relevant times the Company's Code of Business Conduct and Ethics, incorporated by reference in the Company's 2014 10-K, described the Company's purported commitment to the promotion of ethical conduct by its officers, and highlighted "the important and elevated role" of its senior executives in "maintaining [that] commitment."

124. The Company, in the 2014 10-K, also stated that:

> To continue to develop our business, we rely on our management team's knowledge and expertise in the industry and will use our management team's relationships with industry participants, ***specifically those of Mr. Reger our Chief Executive Officer***, to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual arrangements with other oil and natural gas companies. (Emphasis added.)

125. The 2014 10-K further touted Reger's personal pedigree as follows:

> Michael L. Reger is a founder of our predecessor, Northern Oil and Gas, Inc., and has served as Chairman of the Board and Chief Executive Officer of our company since March 2007. ***Mr. Reger has been involved in the acquisition of oil and gas mineral rights for his entire career***. Mr. Reger began working the oil and gas leasing business for his family's company, Reger Oil, in 1992 and worked as an oil and gas landman for Reger Oil from 1992 until co-founding Northern in 2006. Mr. Reger holds a B.A. in Finance and an M.B.A. in finance/management from the University of St. Thomas in St. Paul, Minnesota. ***The Reger family has a history of acreage acquisition in the Williston Basin dating to 1952***. (Emphasis added.)

126. Reger and Stoelk signed the 2014 10-K, which contained false and misleading statements, as well as accompanying certifications which falsely certified that the 2014 10-K "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

127. The statements referenced in ¶¶122-126 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company; (ii) Reger's conduct violated the Company's assurance to investors that executives would maintain honest conduct and adhere to applicable laws and regulations; (iii) Reger's blatant misuse of Company assets violated the Company's commitment to investors to safeguard those assets for legitimate purposes; (iv) Reger's open (but non-public) involvement in running a second oil industry business violated the Company's prohibition of conflicts of interests as communicated to investors; (v) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (vi) Reger was unfit to serve as Northern Oil's CEO; (vii) Northern Oil's stated dependence on Reger caused it overlook his flagrant ethical violations; and (viii) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

128. On March 3, 2016, Northern Oil filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K"). In the 2015 10-K, Northern Oil stated, in part:

***Directors, Executive Officers and Corporate Governance***

. . .

> We have adopted a Code of Business Conduct and Ethics that applies to our chief executive officer, chief financial officer and persons performing similar functions. A copy is available on our website at www.northernoil.com. We intend to post on our website any amendments to, or waivers from, our Code of Business Conduct and Ethics pursuant to the rules of the SEC and NYSE MKT.

129. As described *supra* at ¶97, at all relevant times the Company's Code of Business Conduct and Ethics, incorporated by reference in the Company's 2015 10-K, described the Company's purported commitment to the promotion of ethical conduct by its officers, and highlighted "the important and elevated role" of its senior executives in "maintaining [that] commitment."

130. The Company, in the 2015 10-K, also stated that:

> To continue to develop our business, we rely on our management team's knowledge and expertise in the industry and will use our management team's relationships with industry participants, ***specifically those of Mr. Reger our Chief Executive Officer***, to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual arrangements with other oil and natural gas companies. (Emphasis added.)

131. The 2015 10-K further touted Reger's personal pedigree as follows:

> Michael L. Reger is a founder of our predecessor, Northern Oil and Gas, Inc., and has served as Chairman of the Board and Chief Executive Officer of our company since March 2007. ***Mr. Reger has been involved in the acquisition of oil and gas mineral rights for his entire career***. Mr. Reger began working the oil and gas leasing business for his family's company, Reger Oil, in 1992 and worked as an oil and gas landman for Reger Oil from 1992 until co-founding Northern in 2006. Mr. Reger holds a B.A. in Finance and an M.B.A. in finance/management from the University of St. Thomas in St. Paul, Minnesota. ***The Reger family has a history of acreage acquisition in the Williston Basin dating to 1952***. (Emphasis added.)

132. Reger and Stoelk signed the 2015 10-K, which contained false and misleading statements, as well as accompanying certifications which falsely certified that the 2015 10-K "d[id] not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

133. The statements referenced in ¶¶128-132 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's compliance policies with respect to SEC regulations and the Company's Code of Business Conduct and Ethics were inadequate to detect and/or prevent misconduct by the Company's officers, despite such misconduct being openly on display at the Company, and despite the SEC's investigation of stock manipulation at Dakota Plains being a matter of public record; (ii) Reger's conduct violated the Company's assurance to investors that executives would maintain honest conduct and adhere to applicable laws and regulations; (iii) Reger's blatant misuse of Company assets violated the Company's commitment to investors to safeguard those assets for legitimate purposes; (iv) Reger's open (but non-public) involvement in running a second oil industry business violated the Company's prohibition of conflicts of interests as communicated to investors; (v) consequently, and as a result of the Company's outsize reliance on him, Reger was able to run a second company and engage in illegal stock manipulation during his tenure at Northern Oil; (vi) Reger was unfit to serve as Northern Oil's CEO; (vii) Northern Oil's stated dependence on Reger caused it overlook his flagrant ethical violations; and (viii) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

134. On May 10, 2016, Northern Oil filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31,

2016 (the "2016 Q1 10-Q"). In the 2016 Q1 10-Q , Northern Oil stated, in part:

> General and administrative expense was $4.3 million in the first quarter of 2016 compared to $4.4 million in the first quarter of 2015. Lower compensation expense in 2016 ($0.4 million) was offset by higher legal and professional expense ($0.5 million). The reduction in compensation expense resulted from 2015 third quarter staff reductions and lower incentive plan amounts. The increase in legal and professional expense was primarily due to the Company engaging outside legal counsel to assist it in complying with requests from the SEC relating to an ongoing investigation of 2012 trading patterns in the securities of Dakota Plains Holdings, Inc. ("Dakota Plains"). **Michael Reger, our chief executive officer, was an initial investor in Dakota Plains in 2008. The Company has never owned any interest in Dakota Plains. Based on the information available to it, the Company does not believe that it, or any conduct by the Company, is the focus of any investigation by a governmental agency regarding this matter.** (Emphasis added).

135. Reger and Stoelk signed the 2016 Q1 10-Q, which contained false and misleading statements, as well as accompanying certifications which falsely certified that the 2016 Q1 10-Q "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

136. The statements referenced in ¶¶134-135 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's operations, personnel, and resources were heavily comingled with Dakota Plains at all relevant times; (ii) Reger was not merely "an initial investor in Dakota Plains" in 2008, but, as was widely-understood within Northern Oil, was a control person of Dakota Plains at all relevant times; (iii) The conduct of Northern Oil's CEO, Reger, and his illegal activities conducted while serving in that role and facilitated by Northern Oil employees and resources,

were, in fact, the focus of a governmental investigation; and (iv) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

137. On August 5, 2016, Northern Oil filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "2016 Q2 10-Q"). In the 2016 Q2 10-Q , Northern Oil stated, in part:

> General and administrative expense was $4.6 million in the second quarter of 2016 compared to $4.3 million in the second quarter of 2015. Higher compensation expense ($0.2 million) and higher legal and professional expense ($0.2 million) was offset by lower travel expense ($0.1 million). The increase in compensation expense resulted from higher non-cash share-based compensation which was partially offset by the staff reductions in the third quarter of 2015. The increase in legal and professional expense was in part due to the Company engaging outside legal counsel to assist it in complying with requests from the SEC relating to an ongoing investigation of 2012 trading patterns in the securities of Dakota Plains Holdings, Inc. ("Dakota Plains"). **Michael Reger, our chief executive officer, was an initial investor in Dakota Plains in 2008. The Company has never owned any interest in Dakota Plains. Based on the information available to it, the Company does not believe that it, or any conduct by the Company, is the focus of any investigation by a governmental agency regarding this matter.** (Emphasis added).

138. Reger and Stoelk signed the 2016 Q2 10-Q, which contained false and misleading statements, as well as accompanying certifications which falsely certified that the 2016 Q2 10-Q "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

139. The statements referenced in ¶¶137-138 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Northern Oil's operations, personnel, and resources were heavily comingled with Dakota Plains at all relevant times; (ii) Reger was not merely "an initial investor in Dakota Plains" in

2008, but, as was widely-understood within Northern Oil, was a control person of Dakota Plains at all relevant times; (iii) The conduct of Northern Oil's CEO, Reger, and his illegal activities conducted while serving in that role and facilitated by Northern Oil employees and resources, were, in fact, the focus of a governmental investigation; and (iv) as a result of the foregoing, Northern Oil's public statements were materially false and misleading at all relevant times.

**The Truth Slowly Emerges**

140. On December 16, 2015, the *Star Tribune* in Minneapolis reported that federal authorities had been investigating a price spike in the stock of Dakota Plains after it went public in 2012, "resulting in an windfall for investors who held promissory notes with an unusual payout feature."[6]

141. The *Star Tribune* article went on to state that the investigation, which began in 2014, had been disclosed only recently, "when government attorneys sought a court order to compel one investor to answer questions about her stock and promissory note transactions." The article named Jessica Medlin, Gilbertson's former spouse, as the investor.

142. While the *Star Tribune* article noted that Medlin's transactions in Dakota Plains may have been directed by Gilbertson (identified in the article as the former president of Northern Oil) and that a foundation partly controlled by Gilbertson held approximately $3.5 million of the promissory notes, it did not mention Reger or draw any connection between the suspect transactions and Reger or Northern Oil.

143. In later court filings, Reger acknowledged that Northern Oil, in contrast with its lack of disclosure to investors, had longstanding knowledge of SEC's investigation into Dakota

[6] David Shaffer, "SEC investigating unusual 2012 stock trading at oil train company." *Minneapolis Star Tribune* (Dec. 15, 2016), publicly-available at: http://www.startribune.com/sec-investigating-unusual-2012-stock-trading-at-oil-train-company/362735041/

Plains and Reger himself.

144. On April 16, 2016, the *Star Tribune* revealed that Defendant Reger "was a major participant in an investment deal that is under investigation for suspected stock manipulation, according to documents reviewed by the Star Tribune."[7]

145. On this partial disclosure, which occurred on a non-trading day, Northern Oil stock fell $0.41, or 9.14%, to open at $4.37 on the next trading day, April 18, 2016.

146. On August 16, 2016, Northern Oil filed a Form 8-K in which it announced that Reger was being terminated as its CEO. Northern Oil fired Reger as CEO after Reger told the Company that he had received a Wells Notice from the SEC and faced federal sanctions in connection with the SEC's investigation of 2012 trading patterns in the securities of Dakota Plains, a company in which Reger initially invested in 2008. Northern Oil stated that Reger had been removed from the Company's board, effective immediately, and that the Company did not believe that Reger would be entitled to any severance payment.

147. On this news, Northern Oil stock fell $0.25, or 6.28%, to close at $3.73 on August 16, 2016.

148. On August 17, 2016, Reger filed an action against Northern Oil for breach of contract, defamation, and wrongful termination in Minnesota's Fourth Judicial Court in Minneapolis.

149. In its answer to Reger's complaint against the Company, Northern Oil denied that its internal investigation had not concluded that Reger was an unfit and/or unable CEO.

[7] David Shaffer, "Northern Oil top executive was investor in loan package under SEC investigation." *Minneapolis Star Tribune* (Apr. 16, 2016), publicly-available at: http://www.startribune.com/northern-oil-top-executive-was-investor-in-loan-package-under-sec-investigation/375917671/

150. On October 31, 2016, the SEC filed the Order against Reger, in which Reger agreed to cease violating Sections 17(a)(2) and 17(a)(3) of the Securities Act, and Sections 13(d) and 16(a) of the Exchange Act, and to disgorge $6.5 million, plus prejudgment interest of $669,365.85. The Order also imposed a civil penalty of $750,000.

151. On March 22, 2017, a federal indictment was filed against Gilbertson and other Dakota Plains insiders for thirteen counts of wire fraud related to the scheme to fraudulently manipulate the price of Dakota Plains stock.

152. On September 27, 2017, it was announced that Northern and Reger had settled the latter's wrongful termination claim against the Company. Having waited out the proverbial storm, Northern agreed to pay Reger $750,000 in cash, issue him 3 million shares of the Company's common stock and name him "chairman emeritus."[8]

153. Reger is currently facing civil statutory penalties as a defendant in *Deardeuff v. Northern Oil Holdings, Inc., et al.*, 1:16-cv-09727-WHP (S.D.N.Y.), a class action filed pursuant to the Exchange Act on behalf of Dakota Plains investors damaged by, *inter alia*, Reger's conduct.

154. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages. Reger at all relevant times omitted to disclose his material stock ownership in and control over Dakota Plains, violation of SEC regulations, and participation in a stock manipulation scheme. None of the individually named defendant officers and directors made any such disclosure during the Class Period notwithstanding their knowledge

[8] *See* Nick Williams, "Northern Oil & Gas reaches $3.75M settlement with ousted CEO Michael Reger." *Minneapolis/St. Paul Business Journal* (Sept. 27, 2017), publicly-available at: https://www.bizjournals.com/twincities/news/2017/09/27/northern-oil-gas-reaches-3-75m-settlement-with.html

of Reger's conduct.

155. Only by omitting these material facts and emphasizing Reger's importance to the Company were Defendants able to induce Plaintiff and Class members into paying artificially inflated prices for Northern Oil stock.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

156. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Northern Oil securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

157. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Northern Oil securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Northern Oil or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

160. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Northern Oil;
- whether the Defendants caused Northern Oil to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Northern Oil securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

161. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

162. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Northern Oil securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Northern Oil securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

163. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

164. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

165. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

166. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

167. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Northern Oil securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Northern Oil securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

168. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Northern Oil securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Northern Oil's compliance policies and business prospects.

169. By virtue of their positions at Northern Oil, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative,

Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

170. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Northern Oil securities from their personal portfolios.

171. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As senior managers and/or directors of Northern Oil, the Individual Defendants had knowledge of the details of Northern Oil's internal affairs.

172. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Northern Oil. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Northern Oil's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Northern Oil securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Northern Oil's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the

Class purchased or otherwise acquired Northern Oil securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

173. During the Class Period, Northern Oil securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Northern Oil securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Northern Oil securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Northern Oil securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

174. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

175. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

176. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

177. During the Class Period, the Individual Defendants participated in the operation and management of Northern Oil, and conducted and participated, directly and indirectly, in the conduct of Northern Oil's business affairs. Because of their senior positions, they knew the adverse non-public information about Northern Oil's misstatement of income and expenses and false financial statements.

178. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Northern Oil's financial condition and results of operations, and to correct promptly any public statements issued by Northern Oil which had become materially false or misleading.

179. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Northern Oil disseminated in the marketplace during the Class Period concerning Northern Oil's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Northern Oil to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Northern Oil within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Northern Oil securities.

180. Each of the Individual Defendants, therefore, acted as a controlling person of Northern Oil. By reason of their senior management positions and/or being directors of Northern Oil, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Northern Oil to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Northern Oil and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

181. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Northern Oil.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 25, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Louis C. Ludwig*

Patrick V. Dahlstrom
Louis C. Ludwig
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com
lcludwig@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com

***Lead Counsel for Plaintiff***

**GOLDBERG LAW PC**
Michael Goldberg
1999 Avenue of the Stars – Ste. 1100
Los Angeles, California 90067
Telephone: 1-800-977-7401
Facsimile: 1-800-536-0065
Email: michael@goldberglawpc.com

***Co-Lead Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that on this, the 26th day of January, 2018, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Louis C. Ludwig